UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

STEPHEN PEA                                          CIVIL ACTION

VERSUS                                               NO. 14-1764

DANIEL EDWARDS ET AL.                                SECTION "G" (2)

## REPORT AND RECOMMENDATION

Plaintiff, Stephen Pea, is a prisoner currently incarcerated in the Claiborne Parish Detention Center in Homer, Louisiana. Pea filed this complaint pro se and in forma pauperis pursuant to 42 U.S.C. § 1983 against Tangipahoa Parish Sheriff Daniel Edwards and members of the correctional staff of the Tangipahoa Parish Jail, including Captain Stuart Murphy, Assistant Warden Brandon Pinion, Nurse Allison Thornton and jail kitchen supervisors Patrick Besse and Alex LaPuma (incorrectly named as LaPluma). Pea alleges that defendants violated his First Amendment right to practice his religion by depriving him of an appropriate diet, failed to provide him with adequate medical care and deprived him of an "indigent inmate package," particularly free-of-charge underwear, while he was incarcerated in the Tangipahoa Parish Jail for about two and one-half years from June 2012 through 2014.   He seeks injunctive relief and compensation.  Record Doc. No. 1 (Complaint at ¶¶ IV, V).

On November 13, 2014, I conducted a telephone conference in this matter for all purposes permitted by Spears v. McCotter, 766 F.2d 179 (5th Cir. 1985).  I concluded

at that time that Pea had stated a cognizable claim of violation of his First Amendment right to practice his religion, which required further proceedings.   In view of the applicable legal standard, <u>Moussazadeh v. Tex. Dep't of Crim. Justice</u>, 703 F.3d 781, 790 (5th Cir. 2012), I ordered defendants to file a motion for summary judgment.

## <u>THE RECORD</u>

During the <u>Spears</u> hearing, Pea testified that he is currently incarcerated in the Claiborne Parish Detention Center based upon his conviction in 2013 as a previously convicted felon in possession of a firearm.  He stated that he is serving a ten-year prison sentence.  He testified that he was arrested on that charge in June 2012 and placed in the Tangipahoa Parish Jail, where he was housed for two and one-half years before his transfer to Claiborne Parish.

Pea confirmed that his claims are based upon his allegation that he did not receive the kinds of meals required by both his religion and his medical condition while he was incarcerated in the Tangipahoa Parish Jail.  He clarified that his legal claims arising from these circumstances are both that his First Amendment religious rights were violated and that he did not receive proper medical care while in the jail for his high blood pressure and a hernia.

Plaintiff also said that his claims include an allegation that he did not receive an "indigent package" while in the jail.  He testified that an indigent package includes free

underwear, socks, deodorant and other items for inmates who cannot afford to buy those things in the jail commissary.  He testified that the only underwear he had at the jail was what he was wearing when he arrived in the jail.  He said his underwear "wore out" and he was without underwear and deodorant for about a year.  He testified that he was provided with a jail uniform, soap, toilet paper and toothpaste, but nothing else in the way of personal hygiene materials.

As to his religious rights claim, Pea confirmed the statements in his written submissions that he is a member of the Hebrew Israelite Congregation of Yahweh, which he described as a religion adhering to the laws of the Old Testament.  He testified that he is 54 years old and had been an adherent to the faith for about three years, before which he  was a member of a non-denominational religion.  He said he was attending a Hebrew Israelite church in Independence, Louisiana, before his arrest.

Pea testified that his religion "follows the Old Testament laws," including use of "the true name of the Father . . . and what the King James Bible states.  The main thing is the food laws."  He stated that his religion requires "a kosher meal," which he alleged the jail would not provide.  Pea said a kosher meal is non-pork and prohibits "processed meats," such as hot dogs, baloney and cold cuts, which he said constituted many of the jail meals.  He testified that the jail breakfast was "pretty good," although once a week

it would include bacon, which he would not eat.  He stated that breakfast usually consisted of oatmeal, grits, eggs and bread, all of which was permitted by his diet.

Pea testified that lunch and dinner were frequently problems.  He said the only things served that he could eat without violating his religious food laws were beef stew and chicken, with some biscuits, vegetables and fruit.  He said that sometimes he was provided with appropriate food, but that he experienced problems whenever the jail changed its dietician.  He said beef was provided once every two weeks and chicken twice a week, but the remaining days were usually pork once a week and processed meats "three or four times a week," which "ran my blood pressure up" and which he could not eat for religious reasons.  He said sometimes he was provided with peanut butter and fruit, "almost on a regular basis," which were permitted under his diet, but "too much peanut butter" resulted in "I couldn't go to the bathroom."  He acknowledged that most meals that included foods he could not eat also included foods that he could eat.  He said that some of the canned fruits he received contained preservatives made from pork products.

Pea testified that he was permitted to attend his religious services, along with about 12 other adherents of the faith, while in the jail, and that his principal complaint was the denial of a regular daily kosher diet.  He stated that defendant sergeant Alex

4

LaPuma, the kitchen supervisor, told Pea that the kosher meal "cost too much," for example, permissible salads and tomatoes.

Pea alleged that the difficulties with his diet resulted in high blood pressure. He said he was put on a low sodium diet at the jail "for quite a while." He confirmed that he had received and reviewed the medical records that I ordered defendants to produce. Record Doc. Nos. 9, 23. Pea stated that his other medical problems, for example, that he could not get glasses for his poor eyesight, were not related to his diet. He confirmed the notations in his medical records that he was given medication for his high blood pressure, including what he brought with him when he was arrested, and that he received those medications during his entire stay in the jail. He estimated that his blood pressure was checked four to six times while he was in the jail. He stated that he experienced dizziness "and sometimes I couldn't hardly get out of my bed" because of the high blood pressure. He testified that the low sodium diet he was on at the jail continued to include high-salt, processed meats.

Pea stated that his anticipated date for release from jail is in 2016. He said the relief he seeks in this lawsuit is "a place that would honor my religious beliefs" and monetary compensation for the violation of his rights in an amount that is "whatever the court would do."

The evidence submitted with defendants' summary judgment motion includes three declarations under penalty of perjury, which, among other things, verify plaintiff's attached medical records (excerpts from the verified medical records previously filed under seal in this matter, Record Doc. No. 23) and attached weekly menus of food regularly served at the jail.  Record Doc. No. 25.  The evidence shows that defendant, Family Nurse Practitioner Alison Thornton, ordered a diet for Pea that eliminated red sauce and pork on October 8, 2013, the same date that he requested those diets,[1] and that he was placed on a low sodium diet a month later.  The medical records and declarations demonstrate that Pea received treatment, including regular monitoring and prescription medications, for his high blood pressure throughout his stay at the Tangipahoa Parish Jail.  Declaration of Alison Thornhill, Record Doc. No. 25-5; plaintiff's medical records, Record Doc. Nos. 23, 25-4.

Defendant Patrick Besse, the jail kitchen supervisor, avers that the printed, weekly "No Pork" and "No Red Diet" menus attached to his declaration were served during Pea's incarceration at the jail and would have been combined to eliminate both red sauces and pork for plaintiff.  Besse's declaration and the verified menus are competent

---

[1]Neither side has explained whether the restriction on red sauce was based on plaintiff's medical or religious needs, or both.

evidence of what the jail served to Pea when he was on a pork- and red-sauce-free diet.[2]
For example, Besse declares that when barbecued chicken was served to plaintiff, it
would have been served without sauce and that when gumbo was served, the pork
sausage was replaced by turkey sausage.  Besse states that plaintiff was not served any
pork products.  He avers that kitchen staff adjusted Pea's meals for a low-salt diet by
using less salt or less salty ingredients during cooking.  Declaration of Deputy Patrick
Besse, Record Doc. No. 25-6 at p. 1.  The menus attached to Besse's declaration reflect
that turkey sausage, turkey ham, turkey hot dogs and turkey bologna were used in pork-
free meals, while barbecued chicken had no sauce and the meat sauce for spaghetti was
replaced by a butter and garlic sauce for red-sauce-free meals.  Id. at pp. 2-3.

Defendants have provided copies of food labels for the turkey products used.  Id.
at p. 4.  Dr. Jennifer Jackson, a registered and licensed dietician, declares that the labels
are federally regulated to list all ingredients.  She states that these labels show that the
turkey products contain no pork.  She also avers that the preservatives listed on the labels
are made from sodium, sugars and seaweed, not pork.  Declaration of Dr. Jennifer
Jackson, Record Doc. No. 26-7 at p. 1.

---

[2]Pea attached handwritten, purported menus to the memorandum that he filed after the Spears
hearing.  He states that he wrote these menus based on information given to him by another inmate
at the Claiborne Parish Detention Center, who used to be a kitchen trustee at the Tangipahoa Parish
Jail.  However, Pea admits that these menus are not the ones that were used for inmates like himself
who were on special diets, such as no red sauce or no pork.  Record Doc. No. 24 at p. 1.

## ANALYSIS

I.   STANDARDS OF REVIEW

The current procedural posture of the case requires the court to apply two different legal standards to evaluation of Pea's claims.   First, the familiar summary judgment standards flowing from Rule 56 apply to defendants' motion concerning Pea's religious rights claim.   Second, the court applies the well-established screening standards emanating from 28 U.S.C. § 1915 to determine if Pea's other claims involving his medical care and underwear are legally frivolous or state a cognizable claim.

(A)   SUMMARY JUDGMENT STANDARDS

"A party may move for summary judgment, identifying each claim or defense–or the part of each claim or defense–on which summary judgment is sought.   The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).

Rule 56, as revised effective December 1, 2010, establishes new procedures for supporting factual positions:

> (1)  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including

those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

(2)  Objection That a Fact Is Not Supported by Admissible Evidence.  A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

(3)  Materials Not Cited.  The court need consider only the cited materials, but it may consider other materials in the record.

(4)  Affidavits or Declarations.  An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c).

Thus, the moving party bears the initial burden of identifying those materials in the record that it believes demonstrate the absence of a genuinely disputed material fact, but it is not required to negate elements of the nonmoving party's case.  Capitol Indem. Corp. v. United States, 452 F.3d 428, 430 (5th Cir. 2006) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  "[A] party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to [a particular material] fact."  Advisory Committee Notes, at 261.

A fact is "material" if its resolution in favor of one party might affect the outcome of the action under governing law.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  No genuine dispute of material fact exists if a rational trier of fact could not find

for the nonmoving party based on the evidence presented.  Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd., 40 F.3d 698, 712 (5th Cir. 1994).

To withstand a properly supported motion, the nonmoving party who bears the burden of proof at trial must cite to particular evidence in the record to support the essential elements of its claim.  Id. (citing Celotex, 477 U.S. at 321-23); accord U.S. ex rel. Patton v. Shaw Servs., L.L.C., 418 F. App'x 366, 371 (5th Cir. 2011).  "[A] complete failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial."  Celotex, 477 U.S. at 323; accord U.S. ex rel. Patton, 418 F. App'x at 371.

"Factual controversies are construed in the light most favorable to the nonmovant, but only if both parties have introduced evidence showing that an actual controversy exists."  Edwards v. Your Credit, Inc., 148 F.3d 427, 432 (5th Cir. 1998); accord Murray v. Earle, 405 F.3d 278, 284 (5th Cir. 2005).  "We do not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts."  Badon v. R J R Nabisco Inc., 224 F.3d 382, 394 (5th Cir. 2000) (quotation omitted) (emphasis in original).  "Conclusory allegations unsupported by specific facts . . . will not prevent the award of summary judgment; 'the plaintiff [can]not rest on his allegations . . . to get to a jury without any "significant probative evidence tending to support the

complaint.""" <u>Nat'l Ass'n of Gov't Employees</u>, 40 F.3d at 713 (quoting <u>Anderson</u>, 477 U.S. at 249).

"Moreover, the nonmoving party's burden is not affected by the type of case; summary judgment is appropriate in <u>any</u> case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." <u>Little v. Liquid Air Corp.</u>, 37 F.3d 1069, 1075 (5th Cir. 1994) (quotation omitted) (emphasis in original); <u>accord</u> <u>Duron v. Albertson's LLC</u>, 560 F.3d 288, 291 (5th Cir. 2009).

(B)    <u>SCREENING STANDARDS</u>

A prisoner's pro se complaint for alleged civil rights violations must be screened by the court as soon as practicable after docketing, regardless whether it has also been filed in forma pauperis.  28 U.S.C. § 1915A(a); <u>Thompson v. Hicks</u>, 213 F. App'x 939, 942 (11th Cir. 2007); <u>Lewis v. Estes</u>, 242 F.3d 375, 2000 WL 1673382, at *1 (8th Cir. 2006); <u>Shakur v. Selsky</u>, 391 F.3d 106, 112 (2d Cir. 2004); <u>Martin v. Scott</u>, 156 F.3d 578, 579-80 (5th Cir. 1998);  <u>Lewis v. Sec'y, DOC</u>, No. 2:10-CV-547-FTM-29, 2013 WL 5288989, at *2 (M.D. Fla. Sept. 19, 2013), <u>aff'd</u>, 589 F. App'x 950 (11th Cir. 2014). Such complaints by prisoners must be dismissed upon review if they are frivolous or fail to state a claim upon which relief can be granted.  28 U.S.C. § 1915A(b)(1); <u>Lewis</u>, 589

F. App'x at 952; Thompson, 213 F. App'x at 942; Shakur, 391 F.3d at 113; Carr v. Dvorin, 171 F.3d 115, 116 (2d Cir. 1999).

"A federal court may dismiss a claim in forma pauperis 'if satisfied that the action is frivolous or malicious.'"  Moore v. McDonald, 30 F.3d 616, 620 (5th Cir. 1994) (quoting former 28 U.S.C. § 1915(d), now incorporated in 28 U.S.C. § 1915(e), as amended).  A complaint is frivolous "if it lacks an arguable basis in law or fact." Davis v. Scott, 157 F.3d 1003, 1005 (5th Cir. 1998); Reeves v. Collins, 27 F.3d 174, 176 (5th Cir. 1994).  The law "'accords judges not only the authority to dismiss a claim based on an indisputably meritless legal theory, but also the unusual power to pierce the veil of the complaint's factual allegations and dismiss those claims whose factual contentions are clearly baseless.'"  Macias v. Raul A. (Unknown), Badge No. 153, 23 F.3d 94, 97 (5th Cir. 1994) (quoting Neitzke v. Williams, 490 U.S. 319, 327 (1989)).

The purpose of a Spears hearing is to dig beneath the conclusional allegations of a pro se complaint, to ascertain exactly what the prisoner alleges occurred and the legal basis of the claims.  Spears, 766 F.2d at 180.  "[T]he Spears procedure affords the plaintiff an opportunity to verbalize his complaints, in a manner of communication more comfortable to many prisoners." Davis, 157 F.3d at 1005. The information elicited at such an evidentiary hearing is in the nature of an amended complaint or a more definite statement under Fed. R. Civ. P. 12(e).  Wilson v. Barrientos, 926 F.2d 480, 481 (5th Cir.

1991); <u>Adams v. Hansen</u>, 906 F.2d 192, 194 (5th Cir. 1990).  "Upon development of the actual nature of the complaint, it may also appear that no justiciable basis for a federal claim exists."  <u>Spears</u>, 766 F.2d at 182.

The court may make only limited credibility determinations in a <u>Spears</u> hearing, <u>Norton v. Dimazana</u>, 122 F.3d 286, 292 (5th Cir. 1997) (citing <u>Cay v. Estelle</u>, 789 F.2d 318, 326-27 (5th Cir. 1986), <u>overruled on other grounds by Denton v. Hernandez</u>, 504 U.S. 25, 112 S. Ct. 1728 (1992)), and may consider and rely upon documents as additional evidence, as long as they are properly identified, authentic and reliable.  "The Court should allow proper cross-examination and should require that the parties properly identify and authenticate documents.  A defendant may not use medical records to refute a plaintiff's testimony at a <u>Spears</u> hearing."  <u>Id.</u> (citing <u>Wilson</u>, 926 F.2d at 482-83; <u>Williams v. Luna</u>, 909 F.2d 121, 124 (5th Cir. 1990)).  However, "'[m]edical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference.'"  <u>Gobert v. Caldwell</u>, 463 F.3d 339, 347 n.24 (5th Cir. 2006) (quoting <u>Banuelos v. McFarland</u>, 41 F.3d 232, 235 (5th Cir. 1995)) (internal citations omitted).

After a <u>Spears</u> hearing, the complaint may be dismissed as legally frivolous if it lacks an arguable basis in law, <u>Jackson v. Vannoy</u>, 49 F.3d 175, 176-77 (5th Cir. 1995); <u>Moore v. Mabus</u>, 976 F.2d 268, 269 (5th Cir. 1992), or "as factually frivolous only if the

13

facts alleged are 'clearly baseless,' . . . [or] when the facts alleged rise to the level of the irrational or wholly incredible." Id. at 270.

"'A complaint lacks an arguable basis in law if it is based on an indisputably meritless legal theory, such as if the complaint alleges the violation of a legal interest which clearly does not exist.'" Davis, 157 F.3d at 1005 (quoting McCormick v. Stalder, 105 F.3d 1059, 1061 (5th Cir. 1997)). "When a complaint raises an arguable question of law which the district court ultimately finds is correctly resolved against the plaintiff, dismissal under Rule 12(b)(6) is appropriate; however, dismissal under the section 1915(d) standard is not." Moore, 976 F.2d at 269. A prisoner's in forma pauperis complaint which fails to state a claim may be dismissed sua sponte at any time under 28 U.S.C. § 1915(e)(2) and 42 U.S.C. § 1997e(c)(1).

In this case, plaintiff's complaint regarding his medical care and underwear may be dismissed under 28 U.S.C. § 1915(e) and 42 U.S.C. § 1997e(c)(1), either as frivolous, because his claims lack an arguable basis in law, or under Rule 12(b)(6) in light of his testimony explaining the factual basis of his claims. Plaintiff's complaint regarding his medical care and underwear, as amended by his testimony at the Spears hearing, fails to state a claim under the broadest reading.[3] In addition, defendants' motion for summary

---

[3]The court must "liberally construe briefs of pro se litigants and apply less stringent standards to parties proceeding pro se than to parties represented by counsel," Smith v. Lonestar Constr., Inc., 452 F. App'x 475, 476 (5th Cir. 2011) (quotation omitted); Moore v. McDonald, 30 F.3d 616, 620 (5th Cir. 1994), and I have done so in this case.

judgment should be granted as to Pea's religious rights claim because the competent summary judgment evidence fails to show any triable issue of disputed material fact, and defendants have established that they are entitled to judgment as a matter of law.

II.    <u>RELIGIOUS RIGHTS</u>

"The Constitution requires that 'reasonable opportunities must be afforded to all prisoners to exercise . . . religious freedom.'" <u>Green v. McKaskle</u>, 788 F.2d 1116, 1126 (5th Cir. 1986) (quoting <u>Cruz v. Beto</u>, 405 U.S. 319, 322 n.2 (1972)).  While inmates clearly retain some protections afforded by the First Amendment, the rights of all prisoners are restricted.  "'Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.'" <u>O'Lone v. Estate of Shabazz</u>, 482 U.S. 342, 348 (1987) (quoting <u>Price v. Johnson</u>, 334 U.S. 266, 285 (1948)).  The propriety of limiting prisoners' First Amendment rights "arise[s] both from the fact of incarceration <u>and from valid penological objectives</u>--including deterrence of crime, rehabilitation of prisoners, and institutional security."  <u>Id.</u> (emphasis added).

Evaluation of these valid penological objectives is committed to the judgment of prison administrators, and courts must afford deference to their evaluation.  <u>Id.</u> at 349. Thus, when the action of prison officials impinges on prisoners' constitutional rights, "the regulation is valid if it is reasonably related to legitimate penological interests."  <u>Id.</u>

As to plaintiff's First Amendment rights generally,

[p]rison regulations that impinge on fundamental constitutional rights are reviewed under the deferential standard set forth in Turner v. Safley, 482 U.S. 78 . . . (1987).  Under Turner, "a prison regulation that impinges on inmates' constitutional rights . . . is valid if it is reasonably related to legitimate penological interests."  Turner employs a four-factor test to resolve this inquiry:  (1) whether there is a rational relationship between the regulation and the legitimate government interest advanced; (2) whether the inmates have available alternative means of exercising the right; (3) the impact of the accommodation on prison staff, other inmates, and the allocation of prison resources generally; and (4) whether there are "ready alternatives" to the regulation.  A court "must determine whether the government objective underlying the regulation at issue is legitimate and neutral, and that the regulations are rationally related to that objective."

Freeman v. Tex. Dep't of Crim. Justice, 369 F.3d 854, 860 (5th Cir. 2004) (quoting

Thornburgh v. Abbott, 490 U.S. 401, 414-15 (1989); Turner, 482 U.S. at 89, 91) (citing

O'Lone, 482 U.S. at 349-50); see also Scott v. Miss. Dep't of Corr., 961 F.2d 77, 81 (5th

Cir. 1992) (a court need not "weigh evenly, or even consider, each of these factors," as

rationality is the controlling standard).

Thus, in Freeman, the Fifth Circuit upheld, as rationally related to legitimate

government objectives, the Texas Department of Criminal Justice's ("TDCJ") policy of

offering to all inmates throughout the state's prisons weekly religious services tailored

to five major religious groups, with supplemental services for Church of Christ members

when feasible.  The court held that "staff and space limitations, as well as financial

burdens, are valid penological interests." Id. at 861 (citing Ganther v. Ingle, 75 F.3d 207,

16

211 (5th Cir. 1996)).  Further, the prison system's policy of offering Christian, non-Roman Catholic services provided "'alternative means' of exercising their religious beliefs" to many Church of Christ member inmates.  Id.

The Fifth Circuit rejected the inmates' argument that the prison system must provide religious services that specifically included every element of the Church of Christ's rituals at each of the system's 41 prisons.

> The pertinent question is not whether the inmates have been denied specific religious accommodations, but whether, more broadly, the prison affords the inmates opportunities to exercise their faith.  See Goff v. Graves, 362 F.3d 543, 549 (8th Cir. 2004) ("The critical question for Turner purposes is whether the prison officials' actions deny prisoners their free-exercise rights without leaving open sufficient alternative avenues for religious exercise.").  The quintessential rebuttal of the class's position rests in O'Lone, where the Supreme Court upheld a regulation that prohibited Muslim prisoners from attending Friday afternoon services. Given the availability of a number of other Muslim practices in the prison, the Court upheld the policy.

Id. at 861-62 (citing O'Lone, 482 U.S. at 346-48).

The Freeman court also noted that requiring the TDCJ to provide plaintiffs with weekly services specially tailored to the Church of Christ "would spawn a cottage industry of litigation and could have a negative impact on prison staff, inmates, and prison resources."  Id. at 862; see id. (quoting Turner, 482 U.S. at 90) ("'When accommodation of an asserted right will have a significant "ripple effect" on fellow

17

inmates or on prison staff, courts should be particularly deferential to the informed discretion of correctional officials.'").

In <u>Moussazadeh v. Tex. Dep't of Crim. Justice</u>, 703 F.3d 781 (5th Cir. 2013), the Fifth Circuit addressed the standards for determining whether a prison must provide specialized meals, specifically, kosher meals, to accommodate an inmate's religious practices.

> Under RLUIPA [the Religious Land Use and Institutionalized Persons Act], government entities as a general matter may not "impose a substantial burden on the religious exercise of a person residing in or confined to an institution, . . . even if the burden results from a rule of general applicability." RLUIPA "protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion." The threshold questions for applying RLUIPA are whether a "religious exercise" is at issue and whether the state action places a "substantial burden" on that exercise. Subsumed within the substantial-burden inquiry is the question whether the inmate sincerely believes in the requested religious exercises. . . . A belief not sincerely held cannot be substantially burdened.
> . . . .
> To be . . . sincerely held . . . [,] the adherent [must] have an honest belief that the practice is important to his free exercise of religion. Sincerity of a belief is an essential initial matter in a RLUIPA claim.
> . . . . Sincerity is generally presumed or easily established. When we have inquired as to sincerity, however, we have looked to the words and actions of the inmate.
> . . . . The determination of a substantial burden in general is fact-specific and requires a case-by-case analysis. This is doubly true regarding sincerity.
> . . . .
> Though the sincerity inquiry is important, it must be handled with a light touch, or judicial shyness.

Id. at 790-91, 792 (quoting  42 U.S.C. § 2000cc-1(a); Cutter v. Wilkinson, 544 U.S. 709, 721, 725 n.13 (2005)) (footnotes, additional quotations and additional citations omitted).

In the instant case, defendants do not challenge the sincerity of Pea's belief that pork-free meals are important to his free exercise of religion or that denial of such meals would burden that exercise.  This court therefore accepts the sincerity of Pea's beliefs for purposes of this motion and examines

> whether the plaintiff has established that the burden is substantial.  If it is, the state must "demonstrate[ ] that imposition of the burden . . . (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." There are thus three questions the district court must address . . . :  whether the regulation substantially burdens religious conduct, whether the government has a compelling interest in the regulation, and whether the regulation is the least restrictive means of achieving the interest.

Id. at 792-93 (quoting 42 U.S.C. § 2000cc01(a)).

As to the first question, the Fifth Circuit held in Moussazadeh that "[d]enying all access to kosher food places a substantial burden on the practice of an inmate's faith." Id. at 793 (emphasis added).  The Fifth Circuit distinguished Cutter, in which the Supreme Court had

> noted that "RLUIPA does not require a State to pay for an inmate's devotional accessories."  But . . . Cutter is distinguishable from the case at hand [because] . . . food is an "essential" benefit given to every prisoner, regardless of religious belief.  Based on [additional Supreme Court precedents], denial of religiously sufficient food where it is a generally available benefit would constitute a substantial burden on the exercise of religion.

19

. . . .

Where an inmate is denied a generally available benefit because of his religious beliefs, a substantial burden is imposed on him.

Id. at 793 (citing Cutter, 544 U.S. at 720 n.8).

Nonetheless, "[a] governmental entity can escape the prohibition on substantially burdening religious practice where it establishes that it has a compelling interest in doing so." Id. at 794.  Prison security and/or excessive costs of accommodating the religious practice may constitute such compelling interests in a particular case.  Id.

Finally, if a prison "establishes a compelling interest in security and cost minimization, its chosen means of achieving that interest must be the least restrictive of [plaintiff's] right to exercise his religious beliefs among available, effective alternatives." Id. at 795 (quotation omitted) (citing Ashcroft v. Am. Civil Liberties Union, 542 U.S. 656, 666 (2004)).

Pea testified that defendant Sergeant LaPuma told him that a kosher meal consisting of, for example, permissible salads and tomatoes, would "cost too much." Plaintiff also asserts in his memorandum in opposition to defendants' summary judgment motion that Sergeant LaPuma once told another inmate, "Drek Quebedeaux,"[4] at the Tangipahoa Parish Jail that the sergeant had researched the dietary needs of Hebrew Israelites and that providing a single meal to a single person to accommodate those needs

---

[4]Plaintiff has not submitted any affidavit or declaration from Quebedeaux.

would cost about $50.00.  Plaintiff states in his memorandum that defendants Sheriff Edwards and Captain Murphey refused to authorize funds for such meals.

Defendants in the instant case do <u>not</u> argue that denying Pea access to <u>all</u> kosher food would not have substantially burdened his exercise of his faith.  However, they contend that no substantial burden existed because the competent evidence establishes that they actually provided him with pork- and red-sauce-free meals after he requested those types of meals and that he also received a low-sodium diet.  Pea testified that he received such meals, although he sometimes refused to eat the meat offering, and that he was regularly provided with peanut butter and fruit.  The evidence also establishes that he received numerous other items at three full meals each day, including vegetables, fruit, breads, eggs, chicken and hamburgers, all of which were acceptably edible under his religious requirements.  No evidence supports Pea's allegation that the preservatives used in the products served to him contained pork.  On the contrary, the declaration of Dr. Jackson, a registered and licensed dietician, establishes that the preservatives listed on the food labels of the turkey products are made from sodium, sugars and seaweed and do not contain pork.  Because the undisputed evidence demonstrates that plaintiff was never fed any pork products or red sauce after he requested a diet without those items, he has failed to establish any substantial burden on his religious need for kosher meals.

21

Even if plaintiff could establish that prison officials imposed a substantial burden on his religion by failing to provide <u>all</u> the kosher foods he believes he needed, his own allegations and evidence concerning the cost of additional foods needed to sustain all of his dietary needs establishes that defendants have a compelling interest in reducing those costs to foster both institutional order and the ability to provide proper nutritious meals to <u>all</u> prisoners.  Pea testified that Sergeant LaPuma told him that salads and tomatoes cost too much for the prison to provide them regularly to inmates who needed kosher meals.  Assuming that Pea could produce admissible evidence to support his allegation that LaPuma told inmate Quebedeaux that it would cost the jail $50 <u>per meal</u>, or as much as $150 per day, or $54,750 per year per inmate, to meet all of a Hebrew Israelite's religious dietary needs, that amount is so excessive that it permits defendants to escape the prohibition on substantially burdening Pea's religious practice by failing to provide such meals.  <u>See</u> <u>Moussazadeh</u>, 703 F.3d at 787, 795 (the increased cost of providing kosher food to all observant Texas prisoners, and especially to just one plaintiff, was "minimal" when, "[i]n 2009, TDCJ's expenditures on food service were just over $183.5 million, with a cost per day, per inmate, of $3.87; the cost of food from the Stringfellow kosher kitchen was $6.82.  The total extra cost based on TDCJ's 2009 data is roughly $1,095 per year, per inmate."); <u>Baranowski v. Hart</u>, 486 F.3d 112, 118, 122 (5th Cir. 2007) (finding that logical connection existed between prison policy on inmate diet and

legitimate governmental interest in running a simplified prison food service, and that additional costs to provide kosher meals in the Texas prison system would be excessive when "[t]he state of Florida has reported that it costs them between 12 and 15 dollars per day per offender to provide kosher meals compared with $2.46 per day the State of Texas pays for offender meals" and when pork-free, meatless protein options, including cheese, eggs, beans and peanut butter, were available to all inmates at every meal).  Plaintiff has not identified any available, effective alternatives that defendants could have implemented.  Given defendants' compelling interests in keeping costs low, allocating scarce resources by providing nutritious meals to all inmates and maintaining order in the Tangipahoa Parish Jail, their decision to provide Pea with pork-free meals by substituting turkey products is rationally related to legitimate penological interests and appears to be the least restrictive alternative to provide him with a means to exercise his religious beliefs.

Accordingly, defendants are entitled to summary judgment in their favor as a matter of law on plaintiff's religious rights claim.

III.   <u>MEDICAL CARE</u>

Pea was a pretrial detainee during part of the time period about which he complains and a convicted prisoner during part of the time.  He alleges that he received inadequate medical care for high blood pressure and a hernia.  He testified to his belief

that his diet contributed to his high blood pressure.  He did not testify to any specific complaints about his care for a hernia.

Before the Fifth Circuit's decision in <u>Hare v. City of Corinth</u>, 74 F.3d 633 (5th Cir. 1996), it appeared that prison officials must provide pretrial detainees with reasonable medical care unless the failure to provide it was reasonably related to a legitimate government interest.  <u>Bell v. Wolfish</u>,  441 U.S. 520, 539 (1979); <u>Cupit v. Jones</u>, 835 F.2d 82, 85 (5th Cir. 1987); <u>Mayweather v. Foti</u>, 958 F.2d 91 (5th Cir. 1992).  The inquiry was "whether the denial of medical care . . . was objectively reasonable in light of the Fourteenth Amendment's guarantee of reasonable medical care and prohibition on punishment of pretrial detainees."  <u>Pfannstiel v. City of Marion</u>, 918 F.2d 1178, 1186 (5th Cir. 1990), <u>abrogated on other grounds as recognized in Martin v. Thomas</u>, 973 F.2d 449, 455 (5th Cir. 1992).

In <u>Hare</u>, however, the Fifth Circuit held:

> (1) that the State owes the same duty under the Due Process Clause and the Eighth Amendment to provide both pretrial detainees and convicted inmates with basic human needs, including medical care and protection from harm, during their confinement; and (2) that a state jail official's liability for episodic acts or omissions cannot attach unless the official had subjective knowledge of a substantial risk of serious harm to a pretrial detainee but responded with deliberate indifference to that risk.

<u>Hare</u>, 74 F.3d at 650. The Fifth Circuit explained that for the <u>Bell</u> "reasonable relationship" test to be applicable, the pretrial detainee must be able to show that a prison

official's act either "implement[s] a rule or restriction or otherwise demonstrate[s] the existence of an identifiable intended condition or practice" or that the "official's acts or omissions were sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by other officials, to prove an intended condition or practice." Id. at 645. If the pretrial detainee is unable to prove either, the incident will be considered to be an episodic act or omission, and the deliberate indifference standard enunciated in Estelle v. Gamble, 429 U.S. 97, 104 (1976), will apply. Shepherd v. Dallas Cnty., 591 F.3d 445, 452 (5th Cir. 2009) (citing Bell, 441 U.S. at 539; Scott v. Moore, 114 F.3d 51, 53 (5th Cir. 1997); Hare, 74 F.3d at 649); Tamez v. Manthey, 589 F.3d 764, 769-70 (5th Cir. 2009) (citing Scott, 114 F.3d at 53; Hare, 74 F.3d at 649).

In Estelle, the Supreme Court held that a convicted prisoner may succeed on a claim for damages under 42 U.S.C. § 1983 for inadequate medical care only if he demonstrates that there has been "deliberate indifference to serious medical needs" by prison officials or other state actors. Only deliberate indifference, "an unnecessary and wanton infliction of pain . . . or acts repugnant to the conscience of mankind," constitutes conduct proscribed by the Eighth Amendment. Estelle, 429 U.S. at 105-06; accord Gregg v. Georgia, 428 U.S. 153, 182-83 (1976); Tamez, 589 F.3d at 770; Hare, 74 F.3d at 650. "Deliberate indifference" means that a prison official is liable "only if he knows that the inmates face a substantial risk of serious harm and [he] disregards that risk by

25

failing to take reasonable measures to abate it."  <u>Farmer v. Brennan</u>, 511 U.S. 825, 847 (1994).  The <u>Farmer</u> definition applies to Eighth Amendment medical claims.  <u>Reeves</u>, 27 F.3d at 176.

An inmate must satisfy two requirements to demonstrate that a prison official has violated the Eighth Amendment.  If the court finds that one of the components of the test is not met, it need not address the other component.  <u>Davis</u>, 157 F.3d at 1005.  "First, the deprivation alleged must be, objectively, 'sufficiently serious'; a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities."  <u>Farmer</u>, 511 U.S. at 834 (quotation omitted).  Thus, plaintiff must show that defendants "exhibited deliberate indifference to his serious medical needs."  <u>Cooper v. Johnson</u>, 353 F. App'x 965, 967 (5th Cir. 2009) (citing <u>Wilson v. Seiter</u>, 501 U.S. 294, 297 (1991)); accord <u>Harris v. Hegmann</u>, 198 F.3d 153, 159 (5th Cir. 1999); <u>Mendoza v. Lynaugh</u>, 989 F.2d 191, 193 (5th Cir. 1993).

Further, plaintiff must establish that defendant possessed a culpable state of mind.  <u>Farmer</u>, 511 U.S. at 838 (citing <u>Wilson</u>, 501 U.S. at 298).  A prison official cannot be held liable "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  <u>Id.</u> at 837; <u>accord</u> <u>Tamez</u>, 589 F.3d at 770 (citing <u>Thompson v. Upshur County</u>, 245 F.3d

447, 458-59 (5th Cir. 2001)).  "Such a showing requires the inmate to allege that prison

officials 'refused to treat him, ignored his complaints, intentionally treated him

incorrectly, or engaged in any similar conduct that would <u>clearly evince a wanton

disregard</u> for any serious medical needs.'"  <u>Brewster v. Dretke</u>, 587 F.3d 764, 770 (5th

Cir. 2009) (quoting <u>Domino v. Tex. Dep't of Crim. Justice</u>, 239 F.3d 752, 756 (5th Cir.

2001)) (emphasis added).

> The Supreme Court has recently reaffirmed that "'deliberate indifference'
> is a <u>stringent</u> standard of fault, requiring proof that a municipal actor
> disregarded a known or obvious consequence of his action." . . .  The
> "deliberate indifference" standard permits courts to separate omissions that
> amount to an intentional choice from those that are merely unintentionally
> negligent oversight[s].

<u>Southard v. Tex. Bd. of Crim. Justice</u>, 114 F.3d 539, 551 (5th Cir. 1997) (quoting <u>Bd. of

Cnty. Comm'rs v. Brown</u>, 520 U.S. 397, 410 (1997) (other quotations omitted))

(emphasis added); <u>accord</u> <u>Tamez</u>, 589 F.3d at 770.  "'Subjective recklessness,'" as used

in the criminal law, is the appropriate test for deliberate indifference."  <u>Norton v.

Dimazana</u>, 122 F.3d 286, 291 (5th Cir. 1997).

In the instant case, plaintiff's pleadings, as expanded by his testimony, establish

that nothing more than episodic acts or omissions as defined in <u>Hare</u> are at issue.  <u>See

Tamez</u>, 589 F.3d at 770 (defendants' alleged refusal "to provide [prisoner] with

immediate medical treatment qualifies as an 'episodic act or omission'").  Therefore, the

"deliberate indifference" standard applies and Pea must allege facts sufficient to establish

27

that defendants knew he faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable measures to abate it.  In this case, plaintiff wholly fails to allege facts sufficient to satisfy any of the essential elements of his claim, including especially the stringent "deliberate indifference" standard.

Initially, it cannot be concluded that the conditions plaintiff described, consisting of high blood pressure and a hernia, presented serious medical needs that posed a substantial risk of harm in his particular circumstances.  He testified that he occasionally experienced dizziness and sometimes could not get out of bed because of his high blood pressure, but he voiced no specific complaints caused by a hernia.  I have reviewed his medical records and they contain no mention of any hernia.  Thus, Pea did not suffer "a life-long handicap or permanent loss" of the type required to constitute a serious medical need for constitutional purposes.  See Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1188 (11th Cir. 1994) (citing Monmouth Cnty. v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987) ("Where the delay [in medical care] results in an inmate's suffering 'a life-long handicap or permanent loss, the medical need is serious.'")); see also Fourte v. Faulkner Cnty., 746 F.3d 384, 389 (8th Cir. 2014) (high blood pressure readings alone do not indicate serious medical need); Dickson v. Colman, 569 F.2d 1310, 1311 (5th Cir. 1978) (no serious medical need when plaintiff's high blood pressure presented no "true danger" or "serious threat" to his health).  While high blood pressure and a hernia have the

potential to develop into serious medical needs as defined for constitutional purposes, Pea acknowledged in his testimony, and the medical records reflect, that he was regularly treated with medication for hypertension throughout his incarceration at the Tangipahoa Parish Jail.  There is no indication in the medical records that he had or sought treatment for a hernia.

Even assuming, however, without concluding that Pea's hypertension presented a serious medical need for constitutional purposes, he has alleged facts, confirmed by his testimony and the medical records, that negate any inference of deliberate indifference by jail officials.  His complaint, as amended by his testimony and confirmed by the medical records, shows that he received constitutionally adequate medical care while incarcerated at the jail.  Pea testified and his medical records confirm that he was seen by nurses at the jail for his hypertension and had periodic checks of his blood pressure levels.  Medications were regularly prescribed and given to him and the dosages and type of medicine were changed when medically indicated.  Pea also received a modified diet with no red sauce, no pork and low sodium.  The record as a whole indicates that his condition was monitored, addressed and brought under control.  His blood pressure readings declined from 142/90 (indicating Stage 1 hypertension) on September 12, 2012,

to 123/83 (indicating a pre-hypertensive stage) on March 8, 2014, and he even had one

normal reading of 120/78[5] on January 2, 2014.  Medical records, Record Doc. No. 23.

This record does not support an inference that defendants were deliberately

indifferent to plaintiff's serious medical needs in the constitutional sense.  See, e.g.,

LaBorde v. Lowe, 471 F. App'x 390, 391 (5th Cir. 2012) (no deliberate indifference to

serious medical needs when inmate "received extensive medical care and numerous

prescription medications" for his high blood pressure and any other condition for which

he requested treatment); Greer v. Tran, 124 F. App'x 261, 262 (5th Cir. 2005) (no

deliberate indifference to serious medical needs when inmate was tested for diabetes

mellitus, which was ruled out, although he ultimately died after falling into a diabetic

ketoacidotic coma); Raspberry v. Johnson, 281 F.3d 1279, 2001 WL 1692494, at *1 (5th

Cir. 2001) (citing Domino, 239 F.3d at 754) (Plaintiff with injured hand and bruises

failed to allege deliberate indifference to serious medical needs when he was examined

by medical personnel and injuries healed on their own.); Harris v. Donaldson, 71 F.3d

876, 1995 WL 725438, at *2 (5th Cir. Nov. 3, 1995) (no deliberate indifference when

prisoner received medical treatment for diabetes, including blood monitoring, medication

and other attention, rendering his Section 1983 medical care claim merely a "quarrel with

---

[5]"High blood pressure (hypertension)," Mayo Clinic Staff (Mayo Foundation for Medical Educ. and Research Feb. 21, 2015),
http://www.mayoclinic.org/diseases-conditions/high-blood-pressure/in-depth/blood-pressure/art-20050982?p=1 (visited June 15, 2015).

the quality and quantity of his medical treatment" for his chronic condition); <u>Maldonado</u>

<u>v. Keesee</u>, 12 F.3d 1098, 1993 WL 543329, at *1 (5th Cir. Dec. 15, 1993) (no deliberate

indifference when inmate admittedly was being treated by a doctor at the jail and

receiving medication for high blood pressure).

Although Pea has alleged delay in receiving medical care in that he did not receive

the treatment he thought was necessary quickly enough, and he has expressed

dissatisfaction with the overall speed, quality and initial effectiveness of treatment, none

of his allegations rise to the level of deliberate indifference necessary to establish a

constitutional violation cognizable under Section 1983.

> [T]he decision whether to provide additional treatment is a classic example
> of a matter for medical judgment.  A showing of deliberate indifference
> requires the prisoner to submit evidence that prison officials refused to treat
> him, ignored his complaints, intentionally treated him incorrectly, or
> engaged in any similar conduct that would clearly evince a wanton
> disregard for any serious medical needs.  Deliberate indifference is an
> extremely high standard to meet.

<u>Gobert</u>, 463 F.3d at 346 (footnotes, citations and internal quotations omitted).  No such

showing has been made on the current record.  In Pea's case, the decisions of the jail's

health care providers regarding how to treat his hypertension are classic examples of the

exercise of "medical judgment," which, even if incorrect, cannot serve as the basis for

a finding of deliberate indifference in the constitutional sense.

31

Mere delay in receiving care is not in and of itself a constitutional violation. Easter v. Powell, 467 F.3d 459, 463 (5th Cir. 2006); Mendoza, 989 F.2d at 195; Wesson v. Oglesby, 910 F.2d 278, 284 (5th Cir. 1990).  Regardless of the length of delay, plaintiff at a minimum must show deliberate indifference to serious medical needs. Wilson, 501 U.S. at 298.  No such showing can be made in this case in light of the continuing and successful medical attention Pea received for his hypertension during his incarceration at the Tangipahoa Parish Jail.

Contentions like Pea's that amount to a mere disagreement with the speed, quality or extent of medical treatment or even negligence do not give rise to a Section 1983 claim.  "[A]lthough inadequate medical treatment may, at a certain point, rise to the level of a constitutional violation, malpractice or negligent care does not." Stewart v. Murphy, 174 F.3d 530, 534 (5th Cir. 1999) (citation omitted) (active treatment of prisoner's serious medical condition, which ultimately resulted in death, does not constitute deliberate indifference, even if treatment was negligently administered); see also LaBorde, 471 F. App'x at 391 (plaintiff "received extensive medical care and numerous prescription medications; he has not shown any intentional delay or refusal to provide him with medical treatment for his high blood pressure or any other medical condition for which he requested treatment.  At most, he has established a disagreement with his treatment, unsuccessful treatment, or negligence, which does not amount to a

constitutional violation."); Rowe v. Norris, 198 F. App'x 579, 581 (8th Cir. 2006) (no constitutional violation when inmate disagreed with physician's choice of medication); Jenkins v. Lee, 84 F. App'x 469, 470 (5th Cir. 2004) (Plaintiff's summary judgment evidence and arguments "reflect nothing more than mere disagreement with the care rendered by [the prison doctor], or, at best, malpractice, which are insufficient to establish a constitutional violation," when the doctor prescribed one medication and refused plaintiff's requests for a specific, alternate medication, after plaintiff complained of discomfort, lightheadedness, dizzy spells and nausea, and suffered a blackout due to high blood pressure.); Mendoza, 989 F.2d at 193 (prisoner's disagreement with the type or timing of medical services provided cannot support a Section 1983 claim); Wesson, 910 F.2d at 284 (allegations establishing provision of medical treatment are inconsistent with inference of deliberate indifference); Williams v. Browning, No. V-03-157, 2006 WL 83433, at *1, *3 (S.D. Tex. Jan. 11, 2006) (inmate with diabetes, hypertension, anxiety and chronic knee ailment who alleged that he was unable to obtain his medications timely, but did not establish any substantial harm from the delay, failed to state a claim for deliberate indifference).

Under these circumstances, plaintiff cannot state a cognizable Section 1983 claim that defendants were deliberately indifferent to his serious medical needs. For all of the foregoing reasons, plaintiff's complaints in this case about his medical care advance a

legally frivolous argument and fail to state a claim for relief based upon violation of his constitutional rights under Section 1983.

IV.   NO CONSTITUTIONAL RIGHT TO FREE UNDERWEAR

Pea asserts that he did not receive an "indigent package" while in the jail.  He testified that an indigent package includes free underwear, socks, deodorant and other items for inmates who cannot afford to buy those things in the jail commissary.  He testified that the only underwear he had at the jail was what he was wearing when he arrived in the jail.  He said his underwear "wore out" and he was without underwear and deodorant for about a year.  He testified that he was provided with a jail uniform, soap, toilet paper and toothpaste, but nothing else in the way of personal hygiene materials.  None of plaintiff's assertions rise to the level of constitutional violations cognizable under Section 1983.

"[A]dequate clothing is one of the necessities of life of which State prison officials cannot deprive an inmate."  Knop v. Johnson, 667 F. Supp. 467, 475 (W.D. Mich. 1987) (citing Bellamy v. Bradley, 729 F.2d 416, 419 (6th Cir. 1984)).  However, an "inmate is not entitled to the clothing of his choice."  Id.  The deprivation of clothing alone is not a constitutional violation.  Rather, an inmate may succeed on a claim that he was deprived of clothing only if it is established that the deprivation amounted to the infliction of punishment lacking in penological justification.  LeMaire v. Maass, 745 F.

34

Supp. 623, 639 (D. Ore. 1990), vacated on other grounds, 12 F.3d 1444, 1455 (9th Cir.

1993); Knop, 667 F. Supp. at 475 (citing Rhodes, 452 U.S. at 346-47).

In McCorkle v. Walker, 871 F. Supp. 555, 557 (N.D.N.Y. 1995), aff'd, 100 F.3d

164 (D.C. Cir. 1996), the court held that the lack of a change of underwear for fifteen

days was not unconstitutional.  In addition, a denial of clean clothes, without allegations

of wholly unsanitary conditions, is not a violation of the Eighth Amendment.  Veteto v.

Miller, 829 F. Supp. 1486, 1495-96 (M.D. Pa. 1992).

Pea has failed to make allegations sufficient to establish that his constitutional

rights were violated in this regard.  His testimony establishes that the clothing and

hygiene materials with which he was provided at the Tangipahoa Parish Jail, including

a uniform, uniform, soap and toilet paper, are constitutionally adequate.  Moreover, Pea

does not allege that he is being deprived of new underwear at no cost to him as

punishment.  Under these circumstances, it cannot be said that the actions of jail officials

alleged in the complaint are without penological justification.  Prison officials may

constitutionally charge inmates for certain kinds of goods and services while

incarcerated.  See Morris v. Livingston, 739 F.3d 740, 750-52 (5th Cir.), cert. denied, 134

S. Ct. 2734 (2014) (inmates permissibly charged for medical services while incarcerated;

budgetary control is a legitimate penological interest) (citing Myers v. Klevenhagen, 97

F.3d 91 (5th Cir. 1996)); Slade v. Hampton Roads Reg'l Jail, 407 F.3d 243, 246, 253 (4th

Cir. 2005) (jail's policy of charging pretrial detainee one dollar per day to help defray his housing cost is not punishment and jail "has a legitimate interest in attempting to defray the costs of a prisoner's keep."). Thus, the fact that defendants will provide plaintiff with new underwear only if he pays for it does not violate the Constitution under these circumstances.

## RECOMMENDATION

For all of the foregoing reasons, it is **RECOMMENDED** that defendants' motion for summary judgment be **GRANTED** as to plaintiff's religious rights claim and that this claim be **DISMISSED WITH PREJUDICE**.  It is further **RECOMMENDED** that the remainder of plaintiff's complaint be **DISMISSED WITH PREJUDICE** as legally frivolous and/or for failure to state a cognizable Section 1983 claim.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v.

United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28

U.S.C. § 636(b)(1)).[6]

New Orleans, Louisiana, this _____22nd_____ day of June, 2015.

_____
JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[6]Douglass referred to the previously applicable ten-day period for the filing of objections.  Effective
December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.